**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARRYL WILSON,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | CIVIL ACTION NO.: 11-cv-00631-KD-B |
| | * | |
| **CITY OF BAYOU LA BATRE; MAYOR** | * | |
| **STAN WRIGHT; LOUIS HARD;** | * | |
| **MATTHEW NELSON; and GEORGE** | * | |
| **RAMIRES, in their individual and** | * | |
| **official capacities,** | * | |
| | * | |
| **Defendants.** | * | |

**BRIEF IN SUPPORT OF MOTION TO STAY**
**ON BEHALF OF DEFENDANTS STAN WRIGHT AND LOUIS HARD**

COME NOW, Defendants Stan Wright ("Wright") and Louis Hard ("Hard"), by and through the undersigned counsel, and submits this brief in support of their Joint Motion to Stay (Doc. 5).

**I.     FACTS**

**A.     Introduction**

This lawsuit was filed by Plaintiff Darryl Wilson ("Wilson") against Wright, Hard and two other members of the City of Bayou La Batre, Alabama City Council in their individual and official capacities (Doc. 1).   In his Complaint, Wilson claims civil damages pursuant to 42 U.S.C. §1983, as well as state law, arising out of claimed violations of his rights under the First and Fourteenth Amendments to the United States Constitution and the comparable provisions of the Alabama Constitution of 1901.  Specifically, Wilson alleges that, while he served as a captain

with the City of Bayou La Batre, Alabama Police Department, he was approached "by members of the Federal Bureau of Investigation (FBI) to assist in an investigation involving several City officials including, but not limited to, Defendants Wright and Hard"; that Wilson had "a good faith belief that Defendants Wright and Hard were involved in the mismanagement of federal funds provided to the City of Bayou La Batre"; and that "[a]s a direct result of Plaintiff's participation in an ongoing criminal investigation by the FBI, and providing information to the FBI, Defendants Wright and Hard retaliated against the Plaintiff." (Doc. 1, ¶11, 12, 17). Both Wright and Hard were subsequently served with the Complaint on November 14, 2011. (Doc. 4).

Currently, the deposition of Stan Wright has been noticed by Plaintiff's counsel for Wednesday, February 19, 2014. However, during the course of discovery, several issues have come to light which have serious implications relating to the potential future criminal liability of both Wright and Hard. Defendants submit to the Court that the gravity of these concerns warrant staying the present action pending the resolution of any ongoing criminal investigations, future indictments, or other proceedings. More particularly, these concerns arise from potential forthcoming indictments of Wright and Hard, which Plaintiff's counsel and Plaintiff have recently alluded to during the course of discovery, as well as the history of the criminal trial of Wright, which leaves open the possibility of future indictments for the precise conduct at issue in the present litigation.

### B. Potential Forthcoming Indictments of Wright and Hard

As mentioned previously, Plaintiff's counsel has represented to defense counsel, and more recently to the Court, that Defendants Stan Wright and Louis Hard are the subjects of

ongoing criminal investigations, which may yield future indictments. These potentially forthcoming indictments apparently arise out of an ongoing investigation of Defendants Hard and Wright for alleged misappropriation of "BP" funds awarded to the City of Bayou La Batre, in connection with the "Vessel of Opportunity" program enacted after the BP Deepwater Horizon Gulf oil spill of 2010.

Prior to Plaintiff's counsel's representations, neither Defendants nor defense counsel were aware of any such ongoing investigations, potential criminal indictments, or other issues arising from the alleged misappropriation of BP funds. Moreover, Plaintiff's Complaint does not allege that any investigation, information, or other concerns relating to the appropriation of BP funds played any part in the alleged discrimination, adverse employment decisions, or other actions taken with respect to the Plaintiff. In short, there has been no prior indication that any criminal investigation, allegation of misappropriation, information shared by the Plaintiff with law enforcement agencies, or other concerns relating in any way to BP funds form the basis of the Plaintiff's Complaint.

Most recently, Plaintiff testified on in his February 6, 2014 deposition that he has spoken with federal authorities regarding the appropriation of BP funds after the conclusion of the criminal trial of Stan Wright, indicating an ongoing investigation, stating as follows:

> Q Did you ever talk with [FBI Agent] Amy White after the indictment either in person or by phone?
>
> A Yes.
>
> . . .
>
> Q Did you ever talk with her after the criminal trial of Stan Wright?

A Yes.

Q Am I correct in my understanding that all of your face to face meetings with Ms. White occurred prior to the indictment of Stan Wright?

A No, I had met with her in regards to this investigation as a witness in regards to being asked questions again after the trial of Stan Wright I think on one other occasion, and that was strictly in regards to the BP funds.

. . .

Q After the Wright trial who did you meet with?

A I told you it was [FBI Agent] Amy White and I don't know who the other [FBI] agent was, it was somebody that I didn't know.

Q Was this immediately after the Wright trial or shortly after?

A No, that was probably May or June of '13.

(*See* Partial Rough Draft of 2/6/14 Deposition of Plaintiff Darryl Wilson, **Exhibit A**).

Additionally, on January 31, 2014, Plaintiff's counsel filed with this Court a Motion for Protective Order, or in the alternative, Motion to Quash (Doc. 94), relating to the upcoming testimony of the Plaintiff Darryl Wilson. In her motion seeking to limit Darryl Wilson's testimony, Plaintiff's counsel explicitly represented that her client has provided information to the FBI and U.S. Attorney's office regarding misappropriation of funds relating to the BP Oil Spill. (Doc. 94, at pg. 1-2, 5). Additionally, Plaintiff's counsel explicitly represented that one basis for her request for a protective order is that her client is providing information to authorities as part of an *ongoing* investigation into the conduct of Stan Wright and Louis Hard. (Doc. 94, at pg. 2-5). As outlined above, until very recently, neither Defendants nor defense counsel were aware of any such ongoing investigations, potential criminal indictments, or other issues arising from the alleged misappropriation of BP funds, and the Plaintiff's Complaint does not allege that

any of his claims arise from any such investigations.

Prior to Plaintiff's Motion for Protective Order (Doc. 94) and Plaintiff's deposition, Plaintiff's counsel has recently attempted to elicit testimony regarding these apparent ongoing criminal investigations of Defendants Wright and Hard. She has also sought information relating to the appropriation of BP funds and the Defendants' involvement and knowledge concerning BP funds, including information relating to third parties unrelated to the present action. For example, during the deposition of Defendant George Ramirez, Plaintiff's counsel inquired and made reference to the fact that Hard was a "target" of an FBI investigation:

> Q. Were you aware that the FBI investigation involved charges against or at least was targeting Louis Hard?
>
> A. No.

(*See* Deposition of George Ramirez, **Exhibit B**, at pg. 34). Plaintiff's counsel made similar reference during the deposition of Defendant Matthew Nelson:

> Q. Were you aware that Louis Hard, a city councilman with you during the 2010/2011 commission term was also noted as a target in the investigation of fraud and theft of city property?
>
> MR. HITSON: Object to the form.
>
> MR. REDDITT: Same objection.
>
> MR. RUTENS: Same objection.
>
> BY THE DEPONENT:
>
> A. Yes, after the indictment was handed down.

(*See* Deposition of Matthew Nelson, **Exhibit C**, at pg. 58).

Plaintiff's counsel also attempted to elicit information regarding the appropriation of BP

funds during the deposition of Hard. As demonstrated by the rough draft transcript below, defense counsel vigorously objected to this line of questioning and asserted Fifth Amendment privilege, based upon recent representations of Plaintiff's counsel that indictments were forthcoming against Wright and Hard arising from alleged misappropriation of BP funds:

Q Were you responsible for the approval of city assets that were obtained by BP grant money?

MR. HITSON: Object to the form. Do you know anything about that?

BY THE DEPONENT:
A I don't know anything about that.

Q Those purchase orders didn't come through you?

A The purchase order came through me, but I didn't know how the city clerk paid the bills because I wasn't in charge of paying the bills.

Q But you had to either approve or disapprove the purchase orders; is that correct?

MR. HITSON: Are you talking about specific purchase orders, BP purchase orders?

MS. PILCHER: Purchase orders that were requested to utilize BP grant money.

BY THE DEPONENT:
A No, the city council did that.

Q The city council did that?

A Yes, ma'am.

Q So you had no direct responsibilities with regard to that?

MR. HITSON: Object to the form.

BY THE DEPONENT:
A No, ma'am.

Q The approval of those purchase funds would have been done in open meetings?

A Yes, ma'am.

MR. HITSON: I need to take a break. (Whereupon, a short break was held.)

BY THE DEPONENT:
Q Mr. Hard, have you ever taken part as a councilman in meetings regarding the expenditure of BP funds?

MR. HITSON: Object to the form. Don't answer that question, we're not going there. He's not going to answer any questions about BP funds. You told us yesterday in a meeting with Mark and myself that that was the subject of some U.S. attorney investigation, you weren't interested in that. We're not going there.

MS. PILCHER: It has to do with his authority and/or extension of authority and his relation to the mayor, and I have a right to inquire.

MR. HITSON: You explain how you're entitled all day long to the Court. Unless I'm under order he's not going to answer.

MS. PILCHER: Why don't we contact the judge's office and see if we can do that today because I don't want to have to come back and do more depositions.

MR. HITSON: Get froggy with it, that's what I would say. Get it on.

MS. PILCHER: Let's do that.

MR. HITSON: It's your office.

(Whereupon, a short break was held.)

MR. HITSON: I will say on the record that I think it's important to note that your complaint has indicated that my client is the target of an investigation, you have said that in addition to the complaint on numerous occasions possibly even on the record once or twice, certainly in our discussions yesterday. Yesterday you said you believed that it concerned BP and that you weren't interested in anything that the prosecutor was

doing, and yet here today when we had a suspicion yesterday that you were simply doing the bidding of the U.S. attorney's office asking questions that not only myself but Mark and Tom thought were completely off target in regards to discoverability concerning the claims of my client.

. . .

Q Were you aware that Janey Galbraith had created a consulting service to oversee the expenditure of BP funds?

MR. HITSON: Object to the form. What was the question again?

MS. PILCHER: Was he a aware that Janey Galbraith had created a consulting service to oversee the expenditure of BP funds.

MR. HITSON: I'm going to instruct him not to answer that question because it's outside the limits of the order of the judge earlier today.

MS. PILCHER: I'll review that and see. I'm not going to call the judge again, we'll just submit the deposition and let the judge make a decision.

Q Did the city council with your approval pay Janey Galbraith money with BP funds?

MR. HITSON: I'm asserting my client's rights under the Fifth Amendment, and let me tell you why on the record. I want to make sure the record is clear that during the depositions of this case and off the record in conversation with plaintiff's counsel she has informed us as the sole source of knowledge that Mr. Hard is a target of some federal investigation quote regarding misappropriation of BP funds. We don't know where she's getting this information. We have never heard of that before, and because of that we're not going to answer any questions about that. If that is not true or it's a lie or it's illegal information that's gathered we'll be glad to answer that question, but right now based upon the allegations that have been disclosed solely by plaintiff's counsel we're not going to answer that question under the Fifth Amendment of the United States constitution and Alabama constitution.

BY MS. PILCHER:
Q How much money was Janey Galbraith paid by the city council with BP funds?

MR. HITSON: Don't answer the question, same objection.

MS. PILCHER: I'm not telling you how to do it, but can he actually –

MR. HITSON: No, this is not a criminal case, I'm asserting the objection for him.

MS. PILCHER: I've got case law that says that he needs to assert the Fifth Amendment.

MR. HITSON: Tell the lawyer that you adopt my objection.

BY THE DEPONENT:
A I adopt his objection.

Q Isn't it true that Janey Galbraith was paid over a half a million dollars?

MR. HITSON: Don't answer that question. In her lifetime by anybody, is that what you're asking? If so I object to the form of the question.

BY MS. PILCHER:
Q Isn't it true that Janey Galbraith was paid over a half a million dollars for her administrative review of BP funds?

MR. HITSON: Don't answer the question. Adopt my objection, my assertion of the Fifth Amendment.

BY THE DEPONENT:
A Same thing.

Q Did the city council with your approval of purchase orders pay J&W Marine monies with BP funds and grants?

MR. HITSON: Don't answer the question.

BY MS. PILCHER:
Q Do you adopt his Fifth Amendment assertion?

A I do.

Q Did the city council with your approval of purchase orders pay DeWayne Aldredge monies with BP grant money?

MR. HITSON: Don't answer the question.

BY MS. PILCHER:
Q Do you adopt his Fifth Amendment assertion?

A Yes, ma'am.

Q Did J&W Marine provide itemized statements of expenses incurred in the project that was authorized and adopted by the city council where BP funds were used?

MR. HITSON: What project?

MS. PILCHER: The city vessel of opportunity.

MR. HITSON: Don't answer that question.

MR. RUTENS: Object to the form just to add something different.

MR. HITSON: Go ahead, do what you're supposed to do, adopt my assertion of the privilege.

BY THE DEPONENT:
A I adopt his assertion of the privilege.

Q Mr. Hard, did you have a responsibility to ensure that the payment of any monies to Janey Galbraith were for appropriate city use?

MR. HITSON: Don't answer that question. You mean legal responsibility, contractural responsibility, moral responsibility, what kind of responsibility are you referring to?

MS. PILCHER: Let me back up.

BY MS. PILCHER:
Q You indicated earlier that it was your responsibility to approval purchase order forms; is that correct?

A That's correct.

Q In your capacity as a city councilman who had been delegated the authority to approve purchase orders did you have a responsibility to the

city and to the community to ensure that all purchase orders were reasonably related to legitimate city expenses?

MR. RUTENS: Object to the form.

MR. HITSON: Object to the form. I'm going to instruct him not to answer simply because it's so overly broad that I don't think you can formulate an answer to that question, it's completely unfair. If you've got a specific expenditure that you're referencing then you can ask it, and if it's about BP and the investigation that the U.S. attorney's office has shared with you and/or your client probably violating the law I will be glad to assert a privilege, but he's not going to answer that question, and we're not asserting the privilege on that.

Q Mr. Hard, did you ever question the expenditures submitted by Janey Galbraith in your capacity as city councilman who was delegated the authority to approve purchases?

MR. RUTENS: Object to the form. I don't know that it's been established she submitted purchase orders.

MR. REDDITT: Object to the form.

MR. HITSON: Don't answer that question.

BY MS. PILCHER:
Q You're asserting the fifth amendment; is that correct?

MR. HITSON: We don't know because you were instructed if you're going to get on the topic of BP, which is what you're trying to skirt around without saying so, you're trying to equate payment of Janey Galbraith with approval of purchase orders from departments that I don't think they would be equivalent of one another.

MS. PILCHER: Let me ask it differently.

BY MS. PILCHER:
Q Did Janey Galbraith submit purchase orders related to consulting services that involved the vessel of opportunity project?

MR. HITSON: Don't answer that, assert the privilege.

BY THE DEPONENT:

A I assert the privilege.

Q Did you question in any manner the expenditures or the invoices submitted by Janey Galbraith regarding her consulting services and review of the vessel of opportunity project that was being paid for with BP funds?

MR. HITSON: Object to the form and don't answer that question on the privilege.

BY THE DEPONENT:
A I object to that.

MR. HITSON: Assert the privilege.

BY THE DEPONENT:
A I assert the privilege.

Q Did you question or review the invoices that were submitted by J&W Marine with regard to the vessel of opportunity project?

MR. HITSON: Don't answer that question, and I want to make another note on the record. I would challenge the plaintiff's counsel to show in any reasonable manner how this is -- and I want to mark this for an exhibit, so flag this if you can, Lauren -- I want to show the Court the series of questions and how it can't be calculated to lead to the discovery of admissible evidence in this case. It's nothing but a sham. My client is not guilty of anything, and they're trying to use the criminal justice system to somehow make a civil case, which is generally true about this case that we're here about, but they're trying to make another criminal case it sounds like with the cooperation of the U.S. attorney's office. Don't answer that question.

BY MS. PILCHER:
Q Mr. Hard, did you review any invoices that were submitted by Wayne Eldridge regarding expenditures submitted by him for the vessel of opportunity project, which was to be paid for by BP grant money?

MR. HITSON: Don't answer that question because, and I just realized this, that question does not meet the criteria that the judge said. It had to be about specific expenditures, not generally a topic under some grant or program, it had to be about a specific expenditure.

MS. PILCHER: Wayne Eldridge was a specific expenditure, he was the project manager.

MR. HITSON: Wayne Eldridge is a specific expenditure, a person?

MS. PILCHER: He is a person who was submitting bills as the project manager.

MR. HITSON: Bills for what? No, that's not a specific expenditure.

MS. PILCHER: It is a specific expenditure.

MR. HITSON: I disagree.

MS. PILCHER: I tell you what, the best thing for us to do is for me to get all of these invoices and why don't we come back and we can address this again, maybe that's the best way to do that.

MR. HITSON: I'm not agreeing to anything in regard to coming back, I don't know what the point of that comment is.

MS. PILCHER: Because I don't have all the documents, I haven't been able to get all the documents.

MR. HITSON: I don't know documents you're even referring to.

MR. RUTENS: I will say this, I've not been looking for BP documents because that's not been the focus of any request, it's been concerning the criminal investigation, which as of today I didn't know dealt with BP. So if you want to get me a list I'll be happy to find what I can find. So that's part and parcel of the issue.

MR. HITSON: I'd be careful to say I will find what I can find about the BP because I think you may have an objection, Andy.

MR. RUTENS: There may be an objection, but if it was a properly approved expenditure I would think it would be of public record.

MS. PILCHER: It's public record, I could request it with an open records request, I can do it one of two ways.

MR. RUTENS: I will just have to see what she's looking for. Rest assured, I will hold her to the letter of the rules to make sure I file every objection I need to, but just let me know what it is.

MS. PILCHER: I think that's the better way to handle it. Is everyone in agreement that we can come back? I don't have the invoices in front of me because I'd love to be able to show them to him.

MR. HITSON: I'm not agreeing to anything about that, not a doggone thing.

MR. REDDITT: Are you going to need these for other depositions?

MS. PILCHER: They're not as relevant to Stan Wright.

MR. REDDITT: I'm not agreeing to come back for him.

MS. PILCHER: I don't think we can because I think it's almost impossible to.

MR. HITSON: So sorry, Mary, but I'm not agreeing to anything.

BY MS. PILCHER:
Q Did you receive invoices from Wayne Eldridge for bills related to the vessel of opportunity project that were to be paid from BP funds?

MR. HITSON: Don't answer the question. I don't think that meets the criteria of Judge Bivins' order earlier today, and I object on those grounds. I'm instructing him not to answer the question at all.

MS. PILCHER: That's a specific invoice.

MR. HITSON: It is not a specific invoice.

MS. PILCHER: That's going to be grounds for me to come back, that's a specific invoice that was submitted.

MR. HITSON: I disagree.

BY MS. PILCHER:
Q Did you question any of the invoices that you received from J&W Marine?

MR. HITSON: Don't answer the question, same reason, I won't go into it again.

(*See* Deposition of Louis Hard, **Exhibit D**, at pg. 43-46, 121-33).

In light of the recent representations made by Plaintiff's counsel that Hard and Wright are subject to forthcoming indictments for alleged misappropriation of BP funds, the discovery sought by Plaintiff in the present matter has direct and serious implications on any future criminal indictments and their ability to defend the same. In short, the discovery sought by the Plaintiff in the present matter necessarily touches on the very conduct for which the Defendants may be subject to future criminal liability. As such, the Defendants' ability to defend the present lawsuit will be greatly prejudiced and compromised by the constant threat that any testimony or other discovery in the present matter will affect any future criminal indictment, and their ability to adequately defend against any such indictment. Allowing this matter to proceed before any outstanding criminal investigations, proceedings, or indictments are resolved would greatly prejudice the Defendants.

### C. Criminal Case against Wright

In addition to the concerns outlined above, the conviction of Stan Wright in the matter of *United States of America v. Stanley Marshall Wright, et al.*, in the United States District for the Southern District of Alabama, Southern Division, Criminal Docket number 11-00262, raises serious implications relating to potential future criminal liability for both Wright and Hard. Importantly, though no criminal proceeding is currently pending against Wright or Hard, when coupled with Plaintiff's counsel's representations to defense counsel that investigations are ongoing and indictments are possible, the pleading history of the criminal case against Wright

also raises the specter that Wright may still be subject to further indictments for violations of 18 U.S.C. § 1512(b) and 18 U.S.C. § 1513(e) arising from the conduct at issue in the present matter.

These concerns arise out of charges dismissed from final Superseding Indictment under which the criminal case ultimately proceeded to trial. The original indictment issued against Wright was amended by virtue of three superseding indictments. In the Government's Original, First Superseding, and Second Superseding Indictments, Count Seven contained identical language, and alleged a violation of 18 U.S.C. § 1513(e) as follows:

> From January 2011 continuing through on and through [sic] the date of this indictment, in the Southern District of Alabama, Southern Division and elsewhere, the defendant,
> ### STANLEY MARSHALL WRIGHT
> did knowingly, with the intent to retaliate, take an action harmful to an individual known to the Grand Jury and identified as D.W. which was harmful to and which interfered with the lawful employment and livelihood of D. W., for providing to a law enforcement officer truthful information relating to the possible commission of a Federal offense.
> All in violation of Title 18, United States Code, Section 1513(e).

(*See* 2/9/12 Court Order of Chief District Judge William H. Steele, **Exhibit E**, at pg. 1-2).

Upon a Motion to Dismiss by Wright, Count Seven of the Original, First Superseding, and Second Superseding Indictments was dismissed by Chief United States District Judge William H. Steele, of the United States District Court for the Southern District of Alabama, for failure to sufficiently allege the facts and circumstances giving rise to the offense, and instead merely parroting the language and basic elements of the statute. In dismissing Count Seven of the Original, First Superseding, and Second Superseding Indictments, Judge Steele held as follows:

> As can be readily observed, the indictment does little more than track the language of Section 1513(e), adding only the time of the offense

> (a one-year period from January 2011 through the January 2012 second superseding indictment) and the place of the offense (within this District and elsewhere). The indictment does not identify the truthful information provided by the witness and does not identify any federal offense to the possible commission of which the truthful information relates. Most crucially, the indictment does not identify the action taken by the defendant that was harmful to the witness.
>
> There are at least two "criteria by which the sufficiency of an indictment is to be measured." *Russell* v. *United States,* 369 U.S. 749, 763 (1962). The first is "whether the indictment contains the elements of the offense and sufficiently apprises the defendant of what he must be prepared to meet." *[d.* at 763 (internal quotes omitted). At least by its failure to identify the "action" made the basis of the prosecution, Count Seven fails to satisfy this criterion.

(*Id.*).

In response to Judge Steele's aforementioned Order, the Government issued a more detailed Third Superseding Indictment against Wright, charging him with violations of 18 U.S.C. § 1513(e) and 15 U.S.C. § 1512(b). In support of each Count, the Government alleged that Stan Wright engaged in the same four actions which violated the provisions of sections 1513 and 1512, as follows:

## COUNT SEVEN

. . .

36. From January of 2011 through June of 2011, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

### STANLEY MARSHALL WRIGHT

did knowingly, with the intent to retaliate, take an action harmful to an individual known to the Grand Jury and identified as D.W., to-wit:

(A) Ordering that D.W. be arrested for possessing an assigned police vehicle while he was on sick leave;

(B)     Removing D.W. from his assigned duties as supervisor of major crime investigations and supervisor of patrol officers, and assigning him to work as a uniformed patrol officer;

(C)     Demanding that the Alabama Bureau of Investigations polygraph D.W. and investigate him for theft of money and drugs from the Bayou La Batre Police Department; and

(D)     Ordering that D.W. not participate in federal investigations, including investigations with the Drug Enforcement Administration, thereby depriving D.W. of the ability to earn overtime pay reimbursed to Bayou La Batre by the Organized Crime and Drug Enforcement Task Force.

which was harmful to and which interfered with the lawful employment and livelihood of D.W., for providing to the Federal Bureau of Investigation truthful information about **STANLEY MARSHALL WRIGHT's** activities concerning FEMA and HUD grant money, and relating to the possible commission of a Federal offense, to-wit: Conspiracy to Defraud the United States, in violation of Title 18 United States Code, Section 371; and Theft from Organization Receiving Federal Funds, in violation of Title 18, United States Code, Section 666.

All in violation of Title 18, United States Code, Section 1513(e).

## COUNT EIGHT

. . .

38. From January of 2011 through June of 2011, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

### STANLEY MARSHALL WRIGHT

did knowingly attempt to intimidate, threaten, and corruptly persuade D.W. by:

(A)     Ordering that D.W. be arrested for possessing an assigned police vehicle while he was on sick leave;

(B)     Removing D.W. from his assigned duties as supervisor of major crime investigations and supervisor of patrol officers, and assigning him to work as a uniformed patrol officer;

(C)     Demanding that the Alabama Bureau of Investigations polygraph D.W. and investigate him for theft of money and drugs from the Bayou La Batre Police Department; and

(D)    Ordering that D.W. not participate in federal investigations, including investigations with the Drug Enforcement Administration, thereby depriving D.W. of the ability to earn overtime pay reimbursed to Bayou La Batre by the Organized Crime and Drug Enforcement Task Force.

with the intent to hinder, delay, and prevent the communication to a Federal Bureau of Investigation Agent of information about **STANLEY MARSHALL WRIGHT'S** activities concerning FEMA and HUD grant money, and relating to the possible commission of a Federal offense, to-wit, Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371; and Theft from Organization Receiving Federal Funds, in violation of Title 18, United States Code, Section 666.

All in violation of Title 18, United States Code, Section IS 12(b)(3).

(*See* Third Superseding Indictment of Stanley Marshall Wright, **Exhibit F**, at pg. 10-12).

Wright filed another Motion to Dismiss in response to the Third Superseding Indictment, arguing that Count Seven and Eight of the Indictment were impermissibly duplicitous, as each count charged Wright with multiple distinct underlying federal offenses, stating as follows:

"A count in an indictment is duplicitous if it charges two or more separate and distinct offenses." *United States v. Schlei,* 122 F.3d 944, 977 (II th Cir.1997) (quotation marks and citation omitted). "A duplicitous count poses three dangers: "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." *Id*

The danger of a jury convicting without unanimously agreeing on the same offense is prcsented here. For example, some members of the jury could find that Mayor Wright was guilty of count seven because in February, 2011 he ordered D.W. not to participate in the DEA task force, in retaliation against D.W. for giving 'truthful information' relating to the 'possible' commission ofa violation of 18 U.S.C § §371 as it relates to the HUD grant. Other members of the jury considering count seven could find Wright guilty because in May 2011 he ordered that D.W. be investigated by the ABI after the disappearance of money and drugs from the police property room, and that this was done in retaliation for D.W. providing information relating to the 'possible' federal crime of theft from an organization receiving federal FEMA funds. The permutations go on for

each count and increase the likelihood of jury confusion and a non-unanimous verdict. See *United States v. Burton,* 871 F.2d 1566,1573 (11th Cir. 1989), citing *United States v. UCO Oil Co.,* 546 F.2d. 833, 835(91h Cir. 1976) ("One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense. This may conflict with a defendant's Sixth Amendment rights and may also prejudice a subsequent double jeopardy defense.")

. . .

Counts seven and eight of the third superseding indictment each allege an amalgamation of discrete offenses each of which must be alleged in separate counts. These counts should therefore be dismissed as duplicitous

(*See* Motion to Dismiss Third Superseding Indictment, **Exhibit G**, at pg. 3-4).

Agreeing with the arguments put forward by Wright, Judge Steele ultimately ruled that Counts Seven and Eight of the Third Superseding Complaint were duplicitous, but rather than dismiss the counts outright, Judge Steele required the Government to elect the particular theory under which they would proceed to trial:

Under the *[Bins* v. *United States,* 331 F.2d 390 (5th Cir. 1964)] test, Count Seven is duplicitous. A crime occurs under Section 1513(e) when "any action" is taken against a protected person with the requisite intent and harmfulness. Here, four such actions were allegedly taken with such an intent over a six-month period, and each supports a crime on non-identical evidence.5 To paraphrase *Bins,* "the [taking] of each [harmful action] would constitute a crime, and each should be alleged in a separate and distinct count of the indictment."

Under *Bins,* Count Eight is likewise duplicitous. A crime occurs under Section 1512(b) when the defendant "uses intimidation, threatens or corruptly persuades" a protected person (or attempts to do so) with the requisite intent. Each of the four discrete actions charged in the indictment - on average, one action every two months – represents a separate use of intimidation, threat or corrupt persuasion against D. W., and each supports a crime on non-identical evidence and so constitutes a separate offense under *Bins.*

. . .

Wright allegedly committed four "separate and distinct prohibited acts, made punishable by law," which demonstrates the existence of multiple offenses under Eleventh Circuit precedent regardless of any unifying motive.

. . .

the four charged actions give rise to four separate offenses under Count Seven and another four separate offenses under Count Eight

. . .

Wright posits that the duplicity of Counts Seven and Eight demands their dismissal. (Doc. 210 at 4). However, "[t]he entire count should not be dismissed when a less drastic ruling will suffice," and "[t]h[ e] error [of duplicity] would ... be harmless if the United States were required to elect upon which charge it would proceed." *United States* v. *Goodman,* 285 F.2d 378, 380 (5 th Cir. 1960). A forced election by the government has been repeatedly observed to be an appropriate means of curing duplicity. *E.g., United States* v. *Salinas,* 654 F.2d 319,326 (5th Cir. 1981), *overruled on other grounds, United States* v. *Adamson,* 700 F.2d 953 (11 th Cir. 1983); *United States* v. *Hicks,* 529 F.2d 841,843-44 (5th Cir. 1976); *Thomas* v. *United States,* 418 F.2d 567,568 (5th Cir. 1969); *Reno* v. *United States,* 317 F.2d 499,502 (5th Cir. 1963); *Goodman,* 285 F.2d at 380.

The Court concludes that a pretrial election by the government is the appropriate means of curing the duplicity of Counts Seven and Eight. It would be inappropriate to dismiss these counts and allow the government to seek a fourth superseding indictment including eight counts in place of these two, both because dismissal is discouraged and because the government already has had four opportunities to plead these counts properly and should not be permitted to penalize Wright for its repeated failure to do so.

(*See* 4/12/12 Order of Judge William H. Steele, **Exhibit H**, at pg. 3, 4-5, 6, 7).

In response to Judge Steele's Order, the Government ultimately elected to proceed to trial

against Wright under the sole theory that he violated sections 1513(e) and 1512(b) by "Ordering

that D.W. not participate in federal investigations, including investigations with the Drug

Enforcement Administration, thereby depriving D.W. of the ability to earn overtime pay reimbursed to Bayou La Batre by the Organized Crime and Drug Enforcement Task Force." (*See* United States' Notice of Election Regarding Counts Seven and Eight, **Exhibit I**).

By requiring the Government to make such an election, Judge Steele limited the actions of Wright upon which the Government's prosecution proceeded, and left open the potential for future indictments of Wright under 18 U.S.C. § 1513(e) and 15 U.S.C. § 1512(b), for the remaining actions with which he was initially charged. United States District Court Judge Kristi K. DuBose, of the United States District Court for the Southern District of Alabama, recognized that these unprosecuted acts constitute separate crimes in a subsequent Order, wherein she stated as follows:

> On April 12, 2012, Chief Judge Steele determined that the counts were duplicitious because each act alleged supports "a crime on non-identical evidence and so constitutes a separate offense". (Doc. 267) The Government was required to elect among the acts. *Id*. In reference to a possible superseding indictment (which would charge each act as a separate offense), the court stated, "the government already has had four opportunities to plead these counts properly and should not be permitted to penalize Wright for its repeated failure to do so." *Id.*
>
> The Government elected to proceed on the allegation that Wright ordered D.W. not to participate in federal investigations.

(*See* 2/20/13 Order of Judge Kristi K. DuBose, **Exhibit J**). As a result, Wright remains potentially subject to future criminal indictments for at least six (6) actions based upon the very conduct at issue in the present matter, about which Plaintiff is currently seeking extensive discovery including the sworn testimony of Wright

Additionally, though Defendant Hard has not been charged with any crime as of the date of this filing, Plaintiff's Complaint unequivocally states that Hard is the subject of an "ongoing

criminal investigation by the FBI."  As noted above, Plaintiff's Complaint also alleges both

Wright and Hard retaliated against the Plaintiff by, among other things, demoting him from his

position with the City of Bayou La Batre, Alabama Police Department.  In light of the history of

the criminal proceedings against Wright, the fact that Hard is accused by the Plaintiff of nearly

identical conduct in the present case, and the looming specter of future criminal indictments

against Wright and Hard arising from this very same conduct, allowing this matter to proceed

before any outstanding criminal investigations, proceedings, or indictments are resolved would

greatly prejudice the Defendants' ability to defend any such future charges.


## II.    ARGUMENTS AND CONCLUSIONS OF LAW

The right against self-incrimination applies to civil proceedings:

It is well established that the privilege against self-incrimination protects an
individual not only from "being involuntarily called as a witness against himself
in a criminal prosecution but also privileges him not to answer official questions
put to him in any other proceeding, civil or criminal, formal or informal, where
the answers might incriminate him in future criminal proceedings." *Harrison v.
Wille*, 132 Fd.3d 679, 682 (11th Cir. 1998)(quoting *Lefkowitz v. Turley*, 414 U.S.
70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)).

*U.S. v. Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009).  If Wright and Hard were required to

defend this case while criminal investigations, indictments, or other proceedings are pending and

unresolved, they would be forced to violate their Fifth Amendment right against self-

incrimination.

It is well settled that "[t]he District Court has broad discretion to stay proceedings as an

incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706, 117 S.Ct.

1636, 137 L.Ed.2d 945 (1997).  Right and Hard recognize that "the mere existence of parallel

criminal and civil proceedings does not compel stay of the latter." See *Doe 1 v. City of Demopolis*, 2009 WL 2059311*2 (S.D. Ala.)(quoting *United States v. Lot 5, Fox Grove, Alachua County, Fla.*, 23 F.3d 359, 364 (11th Cir. 1994).   However, the Court "must stay a civil proceeding pending resolution of a related criminal prosecution when 'special circumstances' so require in the 'interest of justice.'" Id.

In considering whether "special circumstances" warrant a stay, courts in this circuit have considered:

> (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interest of the plaintiffs in proceeding expeditiously weighed against the prejudice to the plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest.

*Love v. City of Lanett*, 2009 WL 2525371 *1 (M.D.Ala.); see also *Lay v. Hixon*, 2009 WL 1357384 *3 (S.D.Ala.); *Doe 1 v. City of Demopolis*, 2009 WL 2059311 *3 (S.D.Ala.); *S.E.C. v. Healthsouth Corp.*, 261 F.Supp.2d 1298, 1326 (N.D.Ala. 2003).

Here, examination of some of the most important special circumstances warrants a stay. First there can be no dispute that the issues in the civil case and any ongoing criminal investigation overlap as they both involve allegations of misappropriation of funds and/or intimidation of Wilson.  Furthermore, based on the Plaintiff's representations regarding ongoing criminal investigations and forthcoming indictments, and her continued attempts to seek discovery on these matters, it is clear that the circumstances surrounding Wilson's claims of discrimination due to retaliation are at the heart of both matters.  "Although many factors are relevant, 'the similarity of issues' in the underlying civil and criminal actions is considered the

most important threshold issue in determining whether to grant a stay." *Lay* <u>supra</u>, 2009 WL 1357384 *3 (<u>quoting</u> *Dominquiz v. Hartford Financial Services Group, Inc.*, 530 F.Supp.2d 902, 905 (S.D.Tex. 2008)); <u>see also</u> *Healthsouth*, <u>supra</u>, 261 F.Supp.2d at 136 ("The degree to which the issues in the simultaneous civil and criminal proceedings overlap is the most important threshold issue in deciding whether the court should stay the civil proceeding."). Given the overlap of the instant civil and criminal matters, this factor weighs heavily in favor of a stay.

Secondly, the hardship placed on Wright and Hard, who will lose their right against self-incrimination, will far outweigh any speculative prejudice caused to Plaintiff. Here, any prejudice caused to Plaintiff would be minimal. In contrast, Wright and Hard still enjoy the constitutional privilege against self-incrimination. Should Wright or Hard be forced to testify in the instant case regarding matters relating to apparent ongoing criminal investigations or forthcoming indictments, they would be subjected to more jeopardy than in the criminal case, given the incongruity between the scope of civil discovery and criminal discovery or examination. One court in this circuit noted as follows:

> This court recognizes the dangers of parallel proceedings where the same underlying circumstances are subject to both civil and criminal proceedings. The scope of civil discovery is broad and requires nearly total mutual disclosure of each party's evidence prior to trial. *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 391-92, 91 L.Ed. 451 (1947). Criminal "discovery" under the Federal Rules, in contrast is highly restricted. <u>See, e.g.,</u> Fed.R.Crim.P. 15 and 16. The broad scope of criminal [sic][1] discovery presents a risk that parties may be irresistibly tempted to use that discovery to an advantage in a criminal case.

*S.E.C. v. Zimmerman*, 854 F.Supp. 896, 899 (N.D.Ga. 1993). Again, this risk weighs in favor of a stay in this action.

---

[1]The text of the opinion states "The broad scope of criminal discovery," but given the context of the sentence, the court clearly intended to refer to the "broad scope of civil discovery.

"[T]he Fifth Amendment is violated when a person, who is a defendant in both a civil and a criminal case, is forced to choose between waiving his privilege against self-incrimination or losing the civil case in [summary proceedings]." *Shell Oil Co. v. Altina Associates, Inc.*, 866 F.Supp. 536, 540 (M.D.Fla. 1994); citing *Purvis v. State Farm Fire & Casualty Co.*, 901 F.2d 944 (11th Cir. 1990). To force Wright and Hard to participate in continued civil discovery in light of Plaintiff's counsel's recent representations, as well as the ongoing concern that Wright and Hard are still subject to potential indictment for retaliation against the Plaintiff, would bear directly on their ability to defend themselves, working an extreme prejudice on them. Lastly, the interests of the court also weigh in favor of granting a stay. In *American General Life Ins. Co. v. Jones*, 2008 WL 4949847 (S.D.Ala.), the court considered whether or not to grant a stay in light of the pending criminal charges. On this subject, it noted:

> Until the criminal proceedings have been resolved, it is difficult to conceive of how discovery may constructively be carried out in this action. Given the certainty that [Defendant] will invoke her Fifth Amendment privilege at every turn to avoid prejudicing herself in the criminal case, as a practical matter discovery would be stymied herein if this action were to move forward now.

Id. at *5.

Additionally, in the matter of *David Henry, as Administrator of the Estate of Frank McDevitt, deceased v. City of Prichard, et al.*, in the United States District Court for the Southern District of Alabama, Case No. CA 09-0415-KD-C, Judge William E. Cassady recognized that seeking to compel the testimony of a witness or civil defendant who has a legitimate and/or reasonable fear of prosecution, or who is the subject of an ongoing investigation, violates his Fifth Amendment rights. (*See* 11/2/10 Order of Judge Cassady, **Exhibit K**). In that case, the plaintiff alleged that Frank McDevitt died as a result of the

defendants' failure to monitor his incarceration and provide him medical care while he was held at the City of Prichard Jail.  (*Id.* at pg. 1-2).  During discovery, plaintiff deposed Lorenzo Bennett, warden of the jail at the time McDevitt was incarcerated there.  (*Id.*).  In response to plaintiff's counsel's substantive questioning, Bennett invoked his Fifth Amendment rights against self-incrimination, and indicated he would not testify further, due to an apparent ongoing criminal investigation into the death of Frank McDevitt..  (*Id.* at pg. 2-3).  As a result, the plaintiff filed a motion to compel the testimony of Lorenzo Bennett.  (*Id.* pg. 2-3).

In denying the plaintiff's motion, Judge Cassady determined that Bennett had a legitimate fear of prosecution warranting his invocation of his Fifth Amendment rights against self-incrimination, stating as follows:

> As cited above, the former Fifth Circuit, in *Wheling,* held that a party may assert his Fifth Amendment privilege against self-incrimination "though no criminal charges are pending against him, and even if the risk of prosecution is remote."
>
> The *Wehling* test indicates that a court must ordinarily make two inquiries to determine whether a witness is entitled to assert the privilege and refuse to respond to questioning. First, the court must determine whether answers to the questions might tend to reveal that the witness has engaged in criminal activities. If the answers could not be incriminatory, the witness must answer. *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 92 S.C!. 1670, 32 L.Ed.2d 234 (1972). If answering the questions might incriminate the witness, the court must next ask whether there is a risk, even a remote risk, that the witness will be prosecuted for the criminal activities that his testimony might touch on. As the Seventh Circuit [] observed:
>
> [This determination does not depend] upon a judge's prediction of the likelihood of prosecution. Rather, ... it is only when there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well taken. . .. When a witness can demonstrate any possibility of prosecution which is more than fanciful he has demonstrated a reasonable fear of prosecution sufficient to meet constitutional muster.

*Vincent T Garza Contracting Servs., Inc. v. Harlandale LS.D. Pub. Facilities Corp.,* No. Civ.SA03CA0759-XR, 2004 WL *19210ID,* at *2 (W.D. Tex. Aug. 26, 2004) (quoting *In re Corrugated Container Anti-Trust Litig.,* 620 F.2d 1086, 1091-92 (5th Cir. 1980) (quoting *In re Folding Carton Antitrust Litig.,* 609 F.2d 867, 871 (7th Cir. 1979)), *cert. denied sub nom., Adams Extract Co.* v. *Franey,* 449 U.S. 1102 (1981 )).

As the cases above demonstrate, if an answer to a question posed at the August 19, 2010 Deposition could be incriminatory, criminal charges do not have to be either pending or currently contemplated against Bennett-nor must he necessarily be the subject of a pending inquiry-to allow him to reasonably assert his Fifth Amendment right against self-incrimination. To demonstrate "a reasonable fear of prosecution sufficient to meet constitutional must," he merely must prove that the "possibility of prosecution [ ] is more than fanciful." *In re Folding Carton Antitrust Litig.,* 609 F.2d at 871.

The undersigned finds that Bennett could have possessed "a reasonable fear of prosecution" based *first,* on the fact that Plaintiffs lawsuit alleges, *inter alia,* that he both acted "intentionally or with deliberate indifference" to deny Mr. McDevitt medical treatment *(see* Doc. 1, Compl., Count I, p. 9-10) and through his actions contributed to Mr. McDevitt's death *(see, e.g., id.,* Count XIII [Wrongful Death], pp. 16-17); and *second,* on the fact that the State of Alabama's objection indicating that the "investigation of [Mr. McDevitt's] death is ongoing" (Doc. 62, '\I 2) was served on his counsel, Mr. Rosser, on August 3, 2010 *(id.,* p. 4)---- a little more than two weeks prior to his deposition ***but*** at least seventeen months after the death of Eric Watson, whose death Plaintiffs counsel claims "essentially" ended the criminal inquiry. (Doc. 75, p. 2.) Thus, it was reasonable for Bennett to believe that his answers to deposition questions could be used against him in an ongoing or future criminal prosecution.


. . .


Finding Bennett's fear of prosecution to be reasonable, I must now determine whether the questions asked of him are likely to "furnish a link in the chain of evidence." *Hoffman,* 341 U.S. at 486. Plaintiff argues that Bennett's answers "do not necessarily pose a substantial risk of self-incrimination," and cite *Battle* v. *Barton,* 970 F.2d 779 (11th Cir. 1992), in support thereof. *(See* Doc. 75, p. 2-3.) In that case, the Eleventh Circuit held that the questions that Battle, an inmate, "refused to answer [did] not implicate [his] Fifth Amendment rights because Battle was not faced with substantial hazards of self-incrimination as a result of the panel's questions," which "merely sought Battle's name and prison number."

> *Barton,* 970 F.2d at 781. In contrast, the questions that Bennett refused to answer here "might be dangerous to [him J because[-at the least-] an injurious disclosure could result." *In re Morganroth,* 718 F.2d at 167 (citing *Hoffinan,* 341 U.S. at 486-87). Examples of such questions from the full transcript attached to Plaintiffs motion include: "tell me your supervisory authority over other employees at the Prichard jail" (Doc. 67-1, 12:16-12:18); "[t]ell me each and every fact that you have knowledge of with regard to the dissemination of standard operating procedures at the Prichard jail" *(id.,* 13:21-14:1); "[t]ell me each and every fact you have with regard to the medical treatment of Frank McDevitt" *(id.,* 15:3-15:5); "describe every fact known to you regarding the transportation of Frank McDevitt to USA Medical Center" *(id.,* 18:10-18:12); "provide your opinion as to any particular persons' involvement or fault that led to McDevitt's death" *(id.,* 19:10-19:12); and "describe each and every fact relating to Frank McDevitt's placement in a drunk tank during the time that he was incarcerated in the city jail" *(id, 33:16-33:19).*
>
> Though some of the questions asked during the deposition may appear to be innocuous, they nonetheless may "harbor hidden dangers for the unwary witness." *In re Corrugated Container Antitrust Litig.,* 662 F.2d at 884 (ruling that facially innocuous questions concerning possession of documents nonetheless harbor risks). "The mere potential of incrimination is sufficient to justifY [Bennett's J invocation of the Fifth Amendment privilege." *Anton,* 233 F.R.D. at 220 (citing *In re Corrugated Container Antitrust Litig.,* 662 F .2d at 884 ("seemingly innocent questions also harbor[] hidden dangers for the unwary witness")).

(*Id.* at pg. 5-7, 8-10).

Similar Lorenzo Bennett in the *McDevitt* case, Louis Hard and Stan Wright possess a legitimate fear of future prosecution, based upon Plaintiff's counsel's recent representations, as well as the ongoing concern that Wright and Hard are still subject to potential indictment for retaliation against the Plaintiff. To force Wright and Hard to participate in continued civil discovery in light of these concerns would bear directly on their ability to defend themselves, working an extreme prejudice on them.

This Honorable Court is faced with similar circumstances here. By staying this matter, scarce judicial resources could be reserved until such a time as it is clearer as to whether Hard

and Wright will be subject to future indictments by the Grand Jury.

## III.     CONCLUSION

WHEREFORE, THE FOREGOING PREMISES CONSIDERED, Defendants Stanley
Marshall Wright and Louis Hard pray this Honorable Court will issue a stay of all proceedings
pending resolution of any ongoing criminal matters, and further clarification as to whether
Wright and Hard he will be indicted for additional offenses about which Plaintiff is currently
seeking extensive discovery in the present litigation.


Respectfully submitted,

/s/ *Mark L. Redditt*
MARK L. REDDITT (REDDM5141)
H. FINN COX, JR. (COXHE6462)
*Attorneys for Defendant Stan Wright*


**OF COUNSEL**:
VICKERS, RIIS, MURRAY AND CURRAN, L.L.C.
Post Office Drawer 2568
Mobile, Alabama 36652-2568
Telephone: (251) 432-9772
Facsimile: (251) 432-9781
mredditt@vickersriis.com
fcox@vickersriis.com


/s/ *Kenneth A. Hitson, Jr. (with permission)*
KENNETH A. HITSON, JR. (ASB-9097-N70K)
REBECCA L. CHAMBLISS (ASB-1322-E65D)
*Attorneys for Defendant Louis Hard*


**OF COUNSEL:**
*Holtsford, Gilliland, Higgins, Hitson & Howard, P.C.*
29000 U.S. Highway 98, Suite A-302

Daphne, AL 36526
(251) 447-0234
khitson@hglawpc.com
rchambliss@hglawpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 7, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing of the foregoing to all counsel of record.

/s/ *Mark L. Redditt*
MARK L. REDDITT (REDDM5141)